In re Contribution Rate of the Lord Baltimore Press, Inc.;
Richardson Taylor-Globe Division, Appellee.

(No. 7630—Decided September 22, 1964.)

*Messrs. Frost & Jacobs, Mr. H. J. Siebenthaler* and *Mr. C. A. Atwood,* for appellee.

*Mr. William B. Saxbe,* attorney general, and *Mr. Frederic E. Whitker,* for appellant, Administrator, Bureau of Unemployment Compensation.

*Per Curiam.* Under date of July 16, 1963, the Administrator of the Bureau of Unemployment Compensation of Ohio

held that The Lord Baltimore Press, Inc., Richardson Taylor-Globe Division, was not a successor in interest on January 2, 1962, to the Richardson Taylor-Globe Corporation, and he also affirmed the contribution rate of 3.2 per cent which had been assigned to Lord Baltimore. An appeal was taken from the decision of the administrator to the Court of Common Pleas of Franklin County, which court reversed the decision of the administrator. This appeal on questions of law is from the judgment and final order of the court reversing the decision of the administrator.

Because of the involvement of a number of corporations, and for the sake of convenience and brevity, reference to them will be made as follows: International Paper Company as International; Richardson Taylor-Globe Corporation as RTG; Brown & Bailey Company as B & B; The Lord Baltimore Press, Inc., as Baltimore; and The Mitchell Avenue Company as Mitchell.

Baltimore was a subsidiary of International, B & B a subsidiary of RTG, and Mitchell was the name of RTG effected by amendment of corporate articles on or about January 2, 1962. RTG became the RTG Division of Baltimore following the consummation of a contract of sale entered into with International.

The controversy in the instant case concerns the applicable law. There is little or no dispute as to certain basic facts. As shown in the record of the hearing before the deputy administrator, as hearing officer, August 15, 1962, and the exhibits as accepted and entered in the record, those facts can be summarized as follows:

1. International resolved to purchase the goodwill and business of RTG and B & B, excluding plant, equipment, inventories or other physical assets, cash or accounts receivable, for $2,-600,000, by directors' resolution January 10, 1961. (Employer's exhibit 1.)

2. Agreement consummated March 9, 1961, between International and RTG, and also involving B & B, to accomplish the object of the directors' resolution. (Employer's exhibit 2.)

3. By appropriate resolutions the rights under the March 9, 1961, agreement were assigned to, and the obligations assumed by, Baltimore from International. Baltimore also accepted the

RTG pension trust for employees. (Employer's exhibit 1, items 3 and 4.)

4. By appropriate resolution, December 6, 1961, the shareholders of RTG decided to amend their articles of incorporation by changing the corporate name to Mitchell. (Employer's exhibit 3.)

5. Baltimore filed UCO-1 form, "Report to Determine Liability," for RTG Division, with the bureau, reciting that Baltimore "purchased the goodwill, name and certain intangible assets" from RTG and that Baltimore "has constructed new factory facilities * * * and since January 2, 1962, has operated these facilities" as RTG Division. (Administrator's exhibit 1.)

6. Mitchell continued in operation, and was still in operation at the time of hearing, to complete delivery of products under existing contracts some of which were work already in process. On January 11, 1962, Mitchell employed 190 persons gradually reducing the work force to 20 persons on April 20, 1962.

7. The key personnel of RTG transferred under contract to Baltimore, and gradual absorption of the factory work force by Baltimore continued during the January 11-April 20 period.

8. Mitchell was to terminate its corporate existence when liquidation was completed.

9. Due to the limited area occupied by the RTG physical plant and the fact that expansion was made impossible because it was completely surrounded by railroads and other plants, and due to the age and state of repair of its machinery and equipment, Baltimore was only interested in purchasing the goodwill and intangibles, excluding cash and receivables, of RTG.

The administrator wrote an extended decision, a part of the record, and found that Baltimore was not a successor in interest of RTG. His conclusion was predicated upon the provisions of Section 4141.24 (F), Revised Code, a portion of which reads as follows:

"If an employer transfers his business or otherwise reorganizes such business, the successor in interest shall assume the resources and liabilities of such employer's account, and continue the payment of all contributions due under Sections

4141.01 to 4141.46, inclusive, of the Revised Code. If an employer acquires substantially all of the assets in a trade or business of another employer, or a clearly segregable and identifiable portion of an employer's enterprise, and immediately after the acquisition employs in his trade or business substantially the same individuals who immediately prior to the acquisition were employed in the trade or business or in the separate unit of such trade or business of such predecessor employer, then, upon application to the administrator signed by the predecessor employer and the acquiring employer, the employer acquiring such enterprise is the successor in interest. * * *''

An examination of the section reveals two tests to be applied when it is necessary to determine whether the acquiring employer, Baltimore in this case, is a successor in interest. The acquirer is a successor in interest if he ''acquires substantially all of the assets in a trade or business of another employer'' and if he ''immediately after the acquisition employs * * * substantially the same individuals * * * employed * * * in the trade or business of such predecessor employer.''

The two tests, included in the controlling statute, must be met for Baltimore to become a successor in interest. It is not an ''either * * * or'' situation, but an ''and'' situation. Both requirements must be met. An examination of the second one first disturbs the statutory order but there is no reason to imply that one test is more important than another, so we take that liberty. The word is *immediately*. The statute does not equivocate. It clearly says that to be a successor in interest substantially the same employees must be employed *immediately* after the acquisition.

In the case of *Automatic Plating Co.* v. *Leach,* 120 Ohio App. 145, the test of ''immediate'' employment by the successor in the *Automatic Plating case, supra,* is clearly met. The employees of the predecessor company were told to clock out at a certain time and to clock in as employees of the successor company. This is as close to *immediately* as any take-over arrangement could be made and sharply in contrast to the approximately three-month period required in the change-over from Mitchell to Baltimore.

It should be noted in passing that in the instant case Mitchell was the successor to RTG and not Baltimore. The in-

tangible assets acquired by RTG Division of Baltimore did move, under contract, from the old RTG to the new RTG Division of Baltimore, but except for selected sales and executive personnel the substantial number of the work force, 190 of them, were employed immediately by Mitchell. RTG Division fails completely to pass the test imposed by statute as to employment immediately.

The second test as to a successor in interest, as supplied by statute, is considerably more involved than the one we chose to discuss first. Reference to *Automatic Plating Co. supra*, affords some help. The successor, Automatic, took over all the physical assets of the predecessor, U. S. Plating, possession having been demanded under the terms of a chattel mortgage held by the successor company. Possession was acquired by consent of the mortgagor. Operation of the plant was essentially uninterrupted. In the case before us there was no transfer of tangibles and no possession of, or operation of, the existing plant. Operation continued, however, of the old plant by a successor, Mitchell, to continue until orders were completed and liquidation of tangible assets finished.

Only one point of similarity is present between *Automatic Plating* and the instant case. Both old corporations kept their cash and accounts receivable. It is next to impossible to establish a formula for ascertaining just what is "'substantially all of the assets in a trade or business." The "substantially all" element in the assets transferred from RTG to Baltimore is that intangible, perhaps equally as well described, elusive asset labelled goodwill. If goodwill is to be regarded as an asset, having book value and in accounting existence capable of sale or transfer, it must appear as having "dollar worth" to the one who seeks to sell. Otherwise, its intangible and elusive existence comes into being as a balance sheet item on the accounting records of the purchasing corporation. The item is real on the books of the purchaser having attained value status by the payment of money. Until that point is reached the seller transferred nothing. It merely fathered the creation of a new asset item.

Chapter 4141, Revised Code, is concerned with employer contributions and the maintenance of proper reserves to protect against the unforeseen in the employment market. Again,

if a shift of emphasis in the face of present general conditions, or in the specific case as the law is applied, is necessary, it is the task of the Legislature. And it is equally pertinent to observe that corporations, subject to unemployment contributions, have an interest as limited as that of Chapter 4141, Revised Code. They want to be successors in interest when to be such affords a rate of 1.0 per cent instead of 3.2 per cent as in the instant case, and they prefer not to be successors in interest when the situation is reversed, as was true in the *Automatic Plating Co. case, supra*.

There was no application for a partial transfer in this case. Baltimore built its own new plant and began operations. It bought only certain intangibles from RTG, name goodwill, customer orders (not in process), patents, and trademarks. It employed immediately only a certain limited number of executive and sales people. A few factory people were transferred to the new works, but 190 were immediately employed by Mitchell and transferred gradually, over more than three months, to the new corporation. Baltimore having failed to meet the *two* requirements prescribed by Section 4141.24 (F), Revised Code, it was not a successor in interest to RTG and the Common Pleas Court erred in holding that it was. It was error to reverse the holding of the administrator.

The judgment of the Court of Common Pleas is reversed and the cause is remanded for entry of a judgment finding the decision of the administrator supported by reliable, substantial and probative evidence and according to law.

*Judgment reversed.*

DUFFY, P. J., DUFFEY and TROOP, JJ., concur.